**In the United States District Court
for the District of Kansas**

————————

Case No. 23-cv-01216-TC

————————

LDG RENTALS, LLC,

*Plaintiff*

v.

WESTERN WORLD INSURANCE COMPANY, ET AL.,

*Defendants*

————————

**MEMORANDUM AND ORDER**

Plaintiff LDG Rentals, LLC, the owner of a fallen building, sued its insurer, Western World Insurance Company, for breach of contract. Doc. 1-1. Western World moves for summary judgment. Doc. 146. LDG has also submitted three motions to exclude expert testimony. Docs. 137, 139, 144. For the following reasons, Western World's motion for summary judgment, Doc. 146, is granted in part and denied in part, and LDG's motions to exclude expert testimony, Docs. 137, 139, and 144, are denied, granted in part and denied in part, and denied as moot, respectively.

**I**

**A**

Each type of motion, one seeking summary judgment and the others to exclude expert testimony, has a different standard that governs its resolution. The following describes each applicable standard.

**1.** Summary judgment is proper under the Federal Rules of Civil Procedure when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" when it is necessary to resolve a claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). And disputes over material facts are

1

"genuine" if the competing evidence would permit a reasonable jury to decide the issue in either party's favor. *Id.* Disputes—even hotly contested ones—over facts that are not essential to the claims are irrelevant. *Brown v. Perez*, 835 F.3d 1223, 1233 (10th Cir. 2016). Indeed, belaboring such disputes undermines the efficiency that Rule 56 seeks to promote. *Adler*, 144 F.3d at 670.

At the summary judgment stage, material facts "must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671; *see also* D. Kan. R. 56.1(a)–(c). To determine whether a genuine dispute exists, the court views all evidence, and draws all reasonable inferences, in the light most favorable to the nonmoving party. *See Allen v. Muskogee, Okla.*, 119 F.3d 837, 839–40 (10th Cir. 1997). That said, the nonmoving party cannot create a genuine factual dispute by making allegations that are purely conclusory, *Adler*, 144 F.3d at 671–72, 674, or unsupported by the record. *See Scott v. Harris*, 550 U.S. 372, 378–81 (2007).

The moving party bears the initial burden of showing the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues as to those dispositive matters remain for trial. *Celotex*, 477 U.S. at 324; *Savant Homes*, 809 F.3d at 1137.

**2.** The admissibility of expert testimony is guided by Federal Rule of Evidence 702.[1] *Roe v. FCA US LLC*, 42 F.4th 1175, 1180 (10th Cir. 2022) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)). To fulfill its gatekeeping role, a trial court must ensure that the expert is qualified and that his or her testimony is both reliable and relevant. *Id.* at 1180–81. "Rule 702 requires an expert witness to be qualified by 'knowledge, skill, experience, training, or education.'" *Tudor v. Se. Okla. State Univ.*, 13 F.4th 1019, 1029 (10th Cir. 2021) (quoting Fed R. Evid. 702). Testimony is reliable if "it is based on sufficient data, sound methods, and the facts of the case." *Roe*, 42 F.4th at 1181 (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)). It is relevant if it helps the trier of fact "to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a); *Sanderson v. Wyo. Highway Patrol*, 976 F.3d 1164, 1172 (10th Cir. 2020).

---

[1] Federal law governs the admissibility of evidence in federal diversity cases. *Sims v. Great Am. Life Ins.*, 469 F.3d 870, 880 (10th Cir. 2006).

**B**

Plaintiff LDG Rentals, LLC, is a two-member limited liability company owned by Dawn and Eric Lanning. Doc. 147 at ¶ 18.[2] In 2021, LDG purchased a building in Coffeyville, Kansas. Doc. 134 at ¶ 2.a.i. The 125 year-old building was a two-story masonry and wood-framed structure. Doc. 147 at ¶ 1. Interested in securing insurance for the building, LDG reached out to its insurance agent Acrisure, LLC. *Id.* at ¶¶ 36, 37. LDG told Benjamin Viets of Acrisure that LDG was not an insurance expert, did not know how much coverage to get for the building, and requested Acrisure's advice concerning how much coverage to get. Doc. 163 at ¶ I.10.

Viets informed LDG that he would have to inspect the building and perform certain calculations to determine the right amount of coverage. Doc. 163 at ¶¶ II.15, 19. These calculations were meant to determine the cost of rebuilding the structure with modern pricing. *Id.* at ¶ II.21. Viets performed the inspection and represented to LDG that the building "looked good." *Id.* at ¶¶ II.13, 17. But he did not perform any calculations, and he based his coverage recommendation on the prior owner's insurance coverage. *Id.* at ¶¶ IV.33, 34. Viets recommended a $200,000 policy. *Id.* at ¶ II.23.

LDG followed Viets's opinion and authorized Acrisure to procure a $200,000 policy. Doc. 163 at ¶¶ II.24. Acrisure then reached out to Chris-Leef General Agency, Inc., which is Defendant Western World's managing agent, to secure a policy of insurance for LDG.[3] Doc. 142 at ¶ 1. Chris-Leef arranged for an underwriting inspection before Western World would issue the policy. Doc. 147 at ¶ 57. In August 2022, Overland Surveys conducted the inspection and found no decay or damage in the building. Doc. 142 at ¶ 4; Doc. 162 at ¶ VI.32; *see* Doc. 162-22. LDG then purchased a $200,000 policy from Western World. Doc. 163 at ¶ III.28; *see* Doc. 147-2. That policy is at the core of this dispute.

A few weeks after the survey had been conducted, the north wall of LDG's building partially collapsed. Doc. 134 at ¶ 2.a.iv. LDG then submitted a claim under the policy. *Id.* at ¶ 2.a.v. Western World

---

[2] All references to the parties' briefs are to the page numbers assigned by CM/ECF. All facts are uncontroverted unless otherwise specified.

[3] A managing agent is an intermediary between a retail insurance agent, like Acrisure, and the insurer, like Western World. Doc. 147 at ¶ 46.

retained Parker Loss Consultants to investigate the collapse. Doc. 147 at ¶ 65; *see* Doc. 147-16. Parker Loss determined that the collapse had been caused by deterioration of mortar around bricks, and it recommended hiring a structural engineer for further inspection. Doc. 147 at ¶¶ 68, 71. Western World retained Professional Engineer Justin Johnson, who determined that the collapse had "resulted from long-term age-related deterioration and the failure to maintain the structure." *Id.* at ¶¶ 72–74; *see* Doc. 147-19. Based on these findings, Western World denied the claim. Doc. 134 at ¶ 2.a.viii; Doc. 147 at ¶ 81.

LDG filed suit against Western World in the District Court of Montgomery County, Kansas.[4] Doc. 1-1. The case was subsequently removed to federal court.[5] Doc. 1. In the sole remaining claim, LDG alleges Western World breached the policy by denying its claim. Doc. 134 at ¶ 4.a.i. LDG relies on Section CP 10300607 of the policy, which pays for a building collapse that is abrupt and caused by "[b]uilding decay that is hidden from view, unless the presence of such decay is

---

[4] LDG brought, but subsequently settled, claims against Acrisure. *See* Doc. 181. As a result, all claims concerning Acrisure's conduct—both direct and derivative—have been resolved, which includes any opinions of Acrisure's expert. *See* Docs. 136 & 183. That resolution includes LDG's contention that Western World should be responsible for Acrisure's alleged negligence under a theory of apparent agency. *See* Doc. 162 at 37. But even were that not the case, the claim would have failed for at least two reasons. For one thing, LDG did not assert an independent claim of derivative liability or basis to hold Western World liable in the Pretrial Order, which waives the claim. *Murphy-Sims v. Owners Ins. Co.*, 947 F.3d 628, 630 (10th Cir. 2020). And two, even if the issue had been preserved, LDG has identified no evidence in the record reasonably tending to prove an agency relationship between Western World and Acrisure. *Contra* Doc. 162 at 37.

[5] The parties assume Kansas law applies. Doc. 134 at ¶ 1.d. Thus, their motions are analyzed pursuant to that assumption. *See Digital Ally, Inc. v. Z3 Tech., LLC*, 754 F.3d 802, 812 (10th Cir. 2014). A federal court sitting in diversity must "apply the substantive law of the forum state." *Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 713 (10th Cir. 2014). That law arises from state statute and decisions of a state's highest court. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Here, decisions of the Kansas Supreme Court govern the legal analysis. *Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1280 (10th Cir. 2013) (citing *High Plains Nat. Gas Co. v. Warren Petroleum Co.*, 875 F.2d 284, 288 (10th Cir. 1989)). If the law is ambiguous, a federal district court must look to the Kansas Supreme Court's rulings, "and if no such rulings exist, [it] must endeavor to predict how the high court would rule." *Finstuen v. Crutcher*, 496 F.3d 1139, 1148 (10th Cir. 2007) (quoting *Lovell v. State Farm Mut. Auto. Ins. Co.*, 466 F.3d 893, 899 (10th Cir. 2006)).

known to an insured prior to collapse." Doc. 147-2 at 76; Doc. 162 at ¶ III.7. As a remedy, LDG seeks actual damages, attorney's fees, and reformation of the policy on the basis of mutual mistake. Doc. 134 at ¶4.a.i.

There are four pending motions. Docs. 137, 139, 144, 146. Western World moves for summary judgment, arguing both that the language of the policy and various Kansas doctrines preclude coverage, that reformation is an improper remedy, and that attorney's fees are unavailable. Doc. 146. LDG moves to exclude three of Western World's experts. Docs. 137, 139, 144.

## II

All told, there are four pending motions. Docs. 137, 139, 144, 146. They are considered in the following order. Section II.A deals with Western World's motion for summary judgment. Doc. 146. Section II.B then addresses LDG's motions to exclude expert testimony. Docs. 137, 139, 144.

## A

Western World moves for summary judgment, making several requests. Docs. 146 & 147. That request is granted in part and denied in part.

**1.** Western World makes two arguments concerning the policy language. It claims that LDG's building is not covered by the language of the policy and, even if it were, the collapse is not a covered event. Neither succeeds.

**a.** Western World first seeks summary judgment that there is no coverage under the policy because the building is not "Covered Property" as that term is defined by the policy. Doc. 147 at 23; Doc. 147-2 at 5. The policy defines that term to exclude "[p]roperty which was damaged prior to the inception date of [the policy] and which has not been completely repaired or replaced." Doc. 147-2 at 93. Western World therefore maintains that the building is not Covered Property because it was damaged "years before the Collapse," and it was never repaired or replaced. Doc. 147 at 24.

Disputed issues of fact preclude finding that the building was damaged before the collapse. Much evidence in the record, especially when viewed, as it must be, in the light most favorable to LDG suggests that the building was not damaged before the collapse. For example, the

5

Lannings toured the building during the purchase and noticed no obvious or visible damage. Doc. 162 at ¶ VI.33. Eric Lanning testified in his deposition that the building "looked structurally sound" and "had good bones to it." *Id.* Alicia Yates, who sold the building to LDG, testified that she was unaware of damage or decay in the building. *Id.* Additionally, Benjamin Viets inspected the building before the collapse and noted that "everything looked good." Doc. 163 at ¶ II.17. He also testified that he had insured the building for roughly seven years before LDG bought it and had no knowledge of any decay in it. Doc. 162 at ¶ VI.33. And the Overland Surveys inspection that Western World commissioned as a condition of issuing the policy found no decay or damage in the building. *Id.* at ¶ VI.32. This evidence points to a genuine dispute about whether the building was damaged before the collapse—it is for the jury to make the call. *Cf. Evergreen Recycle, L.L.C. v. Ind. Lumbermens Mut. Ins. Co.*, 350 P.3d 1091, 1116 (Kan. Ct. App. 2015) (reversing grant of summary judgment because issues of fact existed as to whether property was not covered under the policy because of neglect); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.").

**b.** Western World next argues that even if the building qualifies as Covered Property under the policy, LDG cannot establish coverage for the collapse that occurred to the building. Doc. 147 at 24. In particular, it points to a provision of the policy that covers a collapse caused by "[b]uilding decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse."[6] *Id.* at 25. Western World therefore claims it is entitled to judgment as a matter of law because the collapse is not a covered event. Doc. 147 at 25.

The policy does not define the terms "decay," or "hidden from view." But under Kansas law, undefined words in an insurance policy

---

[6] The policy also applies to collapses occurring as a result of a windstorm. Doc. 147-2 at 78. Western World argues that LDG cannot establish that the building collapsed because of a windstorm and, as a result, seeks summary judgment. Doc. 147 at 25. But LDG does not claim—nor does it appear that LDG has ever claimed—that a windstorm caused the collapse. *See* Doc. 162 at ¶ III.7 (LDG's assertion that the only policy provision applicable to the collapse is the one dealing with building decay that is hidden from view); Doc. 162 at 35 (LDG's assertion that the collapse is covered under the "building decay that was hidden from view" provision of the policy, and characterizing it as "Acrisure's theory" that a windstorm caused the collapse). As a result, Western World's motion in this regard is denied as moot.

"are to be given the natural and ordinary meaning they convey to the ordinary mind." *Schartz v. Kansas Health Ins. Ass'n*, 66 P.3d 866, 869 (Kan. 2003). "Decay" means "to decline from a sound or prosperous condition," "to cause or undergo decomposition," or "to break down while spoiling." *Decay*, MERRIAM-WEBSTER DICTIONARY (7th ed. 2023). And "hidden" means "being out of sight or not readily apparent." *Hidden*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/hidden (last visited Apr. 29, 2025); *see Hidden*, DICTIONARY.COM, https://www.dictionary.com/browse/hidden (last visited Apr. 29, 2025) ("concealed; obscure; covert."); *City of Atchison v. Jansen*, 21 Kan. 560, 572 (1879) (noting that a defect on a sidewalk would be hidden if it were "latent and not apparent"); *Latent*, MERRIAM-WEBSTER DICTIONARY (7th ed. 2023) ("Present but not visible or active."); *Apparent*, MERRIAM-WEBSTER DICTIONARY (7th ed. 2023) ("Open to view.").

Once again, disputed issues of fact preclude Western World's request for summary judgment. In particular, there is conflicting evidence regarding whether the building collapsed due to hidden decay. *Contra* Doc. 147 at 25. Evidence in the record, when viewed in the light most favorable to LDG, suggests that any decay was not visible. As noted above, both Viets and the Lannings noticed nothing amiss in the building when they inspected it. Doc. 163 at ¶ II.17; Doc. 162 at ¶ VI.33. The Overland Surveys inspection also noticed no visible decay. Doc. 162 at ¶ VI.33. And Alicia Yates, who sold the building to LDG, testified that she was unaware of any damage or decay to the building. *Id.* Even Justin Johnson, who inspected the building after the collapse, confirmed that the area of the collapse was several feet above the ground and that one could not view it without using a drone or a ladder. *Id.* at ¶ VI.34. This evidence points to a genuine dispute about whether the collapse was caused by decay that was hidden from view, and it is the province of the jury to make the requisite credibility determinations to settle that dispute. *See Welton v. AMCO Ins. Co.*, 180 F. Supp. 3d 825, 829 (D. Kan. 2016) (declining to grant summary judgment when there was a dispute of fact as to whether a collapse was caused by "decay that is hidden from view"); *Liberty Lobby*, 477 U.S. at 249.

**2.** Western World further argues that LDG's claim for breach of the insurance contract fails because of various precepts of Kansas law that preclude recovery. Again, those fail.

**a.** For example, Western World argues that the building collapse was not a fortuitous event and, as a result, Kansas law precludes coverage. Doc. 147 at 22. Western World insists that LDG "had actual or

constructive knowledge of the decay and the imminent collapse because [a wall of the building] was visibly bowed outward." Doc. 170 at 9; *see* Doc. 170-4 (pre-collapse photos of the building that Western World asserts show a bulging wall).

When there is a dispute as to coverage under an all risks policy, the burden is on the insured to establish that the loss was fortuitous. *See Adams-Arapahoe Joint Sch. Dist. No. 28-J v. Cont'l Ins. Co.*, 891 F.2d 772, 775 (10th Cir. 1989) (noting that the requirement of fortuitousness is "implied" and "universally recognized"); *Am. Special Risk Mgmt. Corp. v. Cahow*, 192 P.3d 614, 622 (Kan. 2008) (noting that "[s]imply put . . . an insured cannot obtain coverage for the risk of a known loss"). The burden then shifts to the insurer to show that the loss was excluded by language in the policy. *Texas E. Transmission Corp. v. Marine Office-Appleton & Cox Corp.*, 579 F.2d 561, 564 (10th Cir. 1978). The fortuity doctrine "embodies the concept that one may not obtain insurance for a loss already in progress, or for a loss that the insured either knows of, planned, intended, or is aware is substantially certain to occur." *Am. Special Risk*, 192 P.3d at 622. A fortuitous event "is an event which so far as the parties to the contract are aware, is dependent on chance." *Texas E. Transmission Corp.*, 579 F.2d at 564 (quotation marks omitted); *see also* 10A Couch on Insurance § 148:58 (3d ed. 2024) ("[A] loss that could not reasonably be foreseen by the parties at the time the policy was issued is ordinarily fortuitous.").

Western World has failed to establish that it is entitled to summary judgment based on the fortuity doctrine. The pertinent question is whether either party knew of the defect or expected loss. *Am. Special Risk*, 192 P.3d at 622; *Adams-Arapahoe*, 891 F.2d at 775; *Texas E. Transmission Corp.*, 579 F.2d at 564. Neither party suggests that Western World knew of the defect. And, as set forth above, the evidence when viewed in the light most favorable to LDG suggests that LDG was also unaware of any damage to the building. There is no evidence that anyone who inspected the building before the collapse—the Lannings, Viets, Yates, or Overland Surveys—had any awareness of prior damage or a defect. Doc. 162 at ¶ VI.31–33. This evidence points to a genuine dispute of fact as to whether LDG had knowledge of the decay. *Contra* Doc. 170 at 9; *see also* 10A Couch on Insurance § 148:58 (3d ed. 2024) (noting that "lateral movement of an insured residence due to unstable fill and an unusually heavy rainfall" has been found to be fortuitous). As a result, Western World's argument fails. *Cf. Atchison, Topeka & Santa Fe Ry. Co. v. Stonewall Ins. Co.*, 71 P.3d 1097, 1135 (Kan. 2003) (finding that a loss was fortuitous even when the insured was "aware of a *potential* risk") (emphasis added); *Harmon v. Safeco Ins. Co. of Am.*, 954 P.2d 7, 10 (Kan. Ct. App. 1998) (affirming the lower court's

grant of summary judgment for the insurance company when there was no evidence that the damage to the insured property was caused by "an extraneous and fortuitous cause").

**b.** Western World briefly makes three additional arguments in support of its request for summary judgment. *See* Doc. 147 at 30–32. It argues that the building is not covered because it was "in danger of falling down or caving in," Doc. 147 at 31, that the "wear and tear" exclusion precludes coverage, *id.*, and that the "faulty, inadequate or defective maintenance exclusion" precludes coverage. *Id.*

Western World fails to show that any of these under-developed arguments establishes its entitlement to judgment as a matter of law. This is the result of its failure to support the arguments with citations to Kansas law, the text of the policy, or to evidence in the record, save for two citations to inapposite, unpublished cases from other jurisdictions. *See* Doc. 147 at 31 (citing *316 Charles, LLC v. Liberty Mut. Ins. Co.*, No. 21-0787, 2022 WL 228010 (D. Md. Jan. 26, 2022), and *181 S. Franklin Assocs., Inc. v. Great Am. Ins. Co. of N.Y.*, 980 N.Y.S.2d 277 (N.Y Sup. Ct. July 16, 2013)). This is insufficient at the summary judgment stage. *See* Fed. R. Civ. P. 56(a) (requiring the movant to establish that it is entitled to judgment as a matter of law); *In re Rumsey Land Co., LLC*, 944 F.3d 1259, 1271 (10th Cir. 2019) (noting that the movant on summary judgment must carry its burden "by 'showing'—that is, pointing out to the district court"); *High Desert Relief, Inc. v. United States*, 917 F.3d 1170, 1181 (10th Cir. 2019) (noting that conclusory statements are not enough); *Valdez v. Macdonald*, 66 F.4th 796, 817 (10th Cir. 2023) (noting that arguments raised "in a perfunctory and under-developed manner" are not addressed).

**3.** Western World also takes aim at LDG's request for reformation. By way of background, LDG seeks reformation of the policy to reflect the total cost of repairing the building rather than the $200,000 for which the parties contracted because of the parties' mutual mistake. Doc. 134 at ¶ 4.a.i.g; Doc. 162 at 37–38. *Id.* Western World seeks summary judgment on this claim, arguing that reformation is unavailable as a remedy because there was no mutual mistake. Doc. 147 at 35.

Reformation is an equitable remedy that permits a court to correct mutual mistakes in a contract. *Liggatt v. Emps. Mut. Cas. Co.*, 46 P.3d 1120, 1128 (Kan. 2002). It is an extraordinary remedy that must be employed "only with great caution." *Evergreen Recycle, L.L.C. v. Indiana Lumbermens Mut. Ins. Co.*, 350 P.3d 1091, 1120 (Kan. Ct. App. 2015). Kansas courts seldom reform contracts absent evidence of "fraud,

mistake, duress, undue influence, unconscionability, or evidence that the contract as written will cause harsh or unreasonable results." *Id.*

Where reformation is sought on the ground of mistake, the parties must establish mutuality of mistake by clear and convincing evidence. *Evergreen Recycle*, 350 P.3d at 1120. A party seeking to prove mutual mistake concerning a written instrument must show "(1) an antecedent agreement that the written instrument undertakes to evidence; (2) that a mistake occurred in drafting the instrument and not the antecedent agreement it undertakes to evidence; and (3) when there is no fraud or inequitable conduct by a party, that the mistake is mutual." *Unified Gov't of Wyandotte Cnty./Kan. City v. Trans World Transp. Servs., L.L.C.*, 227 P.3d 992, 995 (Kan. Ct. App. 2010). "To entitle a party to a reformation, a high order of proof is necessary to establish that a mistake was made, and further that it was the intention of both parties to make the agreement which the plaintiff alleges was really made." *Algeo v. Employers' Indem. Corp.*, 237 P. 879, 880 (Kan. 1925) (citation omitted).

Reformation is unavailable in this case because there is no evidence that both Western World and LDG were mistaken. Western World offered and LDG agreed to pay for a policy that provided LDG with $200,000 of coverage. Doc. 163 at ¶ II.24; Doc. 147-2 at 50. There is no evidence that LDG and Western World understood that the amount of coverage would be—as LDG now seeks—replacement value. *Contra* Doc. 162 at 39; *see Algeo*, 237 P. at 880 (describing what would be necessary for reformation to be available).

LDG attempts to avoid this conclusion by arguing that "[a] mutual mistake exists because LDG . . . can prove it made statements to Acrisure concerning coverage desired, but the policy issued does not provide the desired coverage." Doc. 162 at 39. But even if Acrisure had been mistaken about what LDG wanted, that is immaterial because Acrisure was not a party to the contract. The only two parties to the insurance agreement were LDG and Western World. Doc. 147-2. And there is nothing in the record showing that Western World was mistaken or that the real agreement was what LDG now wants it to be. As a result, LDG's request for reformation as a remedy fails. *See U.S. Fid. & Guar. Co. v. Burress*, 844 F. Supp. 1475, 1480 (D. Kan. 1994) (noting that reformation is meant "to have the document reformed to reflect the true agreement *of the parties*") (emphasis added); *Rosenbaum v. Texas Energies, Inc.*, 736 P.2d 888, 893 (Kan. 1987) ("It has been held that a mistake of law does not excuse a party to a contract, unless it be a mutual mistake *of both parties thereto* . . . .") (emphasis added); *Fischer Imaging Corp. v. Gen. Elec. Co.*, 187 F.3d 1165, 1169 (10th Cir. 1999) ("Reformation is an equitable remedy used to reframe written

contracts to reflect accurately [the] real agreement between contracting parties . . . .") (quotation marks omitted) (alteration in original); *see also Reformation*, Black's Law Dictionary (12th ed. 2024)) ("An equitable remedy by which a court will modify a written agreement to reflect the actual intent of the parties.").

At best, LDG relies on a unilateral mistake. That is, as a matter of law, immaterial: That one party to a contract was mistaken is not cause for reformation. *See New York Life Ins. Co. v. Dickensheets*, 193 P.2d 649, 655 (Kan. 1948) (affirming the trial court's finding that there was no mutual mistake where "the defendant was not mistaken"); *Eucalyptus Real Est., LLC v. Innovative Work Comp Sols., LLC*, 676 F. Supp. 3d 938, 963 (D. Kan. 2023) (quoting *Anco Constr. Co., Ltd. v. City of Wichita*, 660 P.2d 560, 562 (Kan. 1983) (finding no mutual mistake where the mistake was "a *unilateral* mistake on plaintiffs' part," and noting that "the law simply doesn't allow 'reformation of a contract in instances involving unilateral mistake.'") (emphasis in original); *cf. Trans World Transp. Servs.*, 227 P.3d at 996 (finding a mutual mistake when both parties to a deed were mistaken as to what it conveyed). LDG's request for reformation is therefore precluded.

**4.** Western World also seeks summary judgment on LDG's request for attorney's fees. Doc. 147 at 38. It asserts that the evidence does not support an award under the relevant statute, K.S.A. § 40-256, which provides that a plaintiff who secures a judgment against an insurance company is entitled to attorney's fees "if it appear[s] from the evidence that such company . . . has refused [payment] without just cause or excuse." Kan. Stat. Ann. § 40-256.

This request is premature. Courts address awards of attorney's fees under Section 40-256 after the plaintiff has secured a judgment. *See, e.g.*, *Wiles v. Am. Fam. Life Assur. Co. of Columbus*, 350 P.3d 1071, 1076 (Kan. 2015) (addressing award of attorney's fees after judgment in a bench trial); *Evans v. Provident Life & Acc. Ins. Co.*, 815 P.2d 550, 560–61 (Kan. 1991) (addressing award of attorney's fees after a jury trial); *Hartford Fire Ins. Co. v. Vita Craft Corp.*, 911 F. Supp. 2d 1164, 1183 (D. Kan. 2012) (awarding attorney's fees after granting plaintiff summary judgment). Indeed, the plain text of the statute notes that attorney's fees are proper in an action "in which judgment is rendered against any insurance company." Kan. Stat. Ann. § 40-256. No judgment has been rendered here. Where summary judgment is denied because there are genuine issues of material fact, it is improper to address an award of attorney's fees under Section 40-256. *See O'Donoghue v. Farm Bureau Mut. Ins. Co.*, 49 P.3d 22, 28 (Kan. Ct. App. 2002) (affirming the trial court's decision to deny a motion for attorney's fees as premature

during a hearing on motion for partial summary judgment); *Peoples Mortg. Corp. v. Kansas Bankers Sur. Tr. Co.*, 176 F. Supp. 2d 1199, 1207 (D. Kan. 2001) (reserving judgment until after trial). As a result, this request is denied without prejudice.

**B**

LDG has also filed three motions to exclude expert testimony. Docs. 137, 139, 144. Each is addressed in turn.

**1.** LDG first moves to exclude the testimony of Western World's structural engineer, Christopher Wilkens. Doc. 137. He will opine, *inter alia*, that there was a bulge in the building, which signifies damage and decay, that was visually apparent. Doc. 154 at 3. Wilkens based this opinion, in part, on his analysis of pre-collapse photographs. *See* Doc. 170-4 (photographs). LDG argues that this testimony will not assist the trier of fact because it is not scientific and the jury can look at the photographs and determine whether a bulge was visibly apparent. Doc. 138 at 5–7.

Relevant expert testimony must advance a material aspect of the case and be sufficiently tied to the facts such that it will aid the jury. *United States v. Cushing*, 10 F.4th 1055, 1079 (10th Cir. 2021). "In assessing whether testimony will assist the trier of fact, district courts consider several factors, including whether the testimony is within the juror's common knowledge and experience, and whether it will usurp the juror's role of evaluating a witness's credibility." *Id.* Courts sometimes exclude expert testimony that encroaches on the jury's basic senses. *See, e.g.*, *Mosqueda v. Family Dollar Stores of Mich., LLC*, 592 F. Supp. 3d 616, 626 (E.D. Mich. 2022) (granting motion to exclude because "the jurors should have little to no issue determining whether the remnant was open or obvious, as it is within the realm of their five senses, particularly sight"); *cf. Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 241 (6th Cir. 2010) (noting that "[t]he prototypical example of [lay witness testimony] relates to the appearance of persons or things") (quotation marks omitted). But expert testimony can also be useful to help the jury understand what it sees. *See United States v. Rodriguez-Felix*, 450 F.3d 1117, 1125 (10th Cir. 2006) (noting in the context of eyewitness identifications that "an expert's testimony describing how certain factors, falling outside a typical juror's experience, may affect a[n] eyewitness's identification is the very type of scientific knowledge to which *Daubert*'s relevance prong is addressed").

Wilkens's testimony will help the trier of fact understand the pre-collapse photographs. *Contra* Doc. 138 at 5–7. While the jury may not

need expert testimony to determine whether the wall was bulging, Wilkens's expertise will help them understand the bulge within a framework and how it might affect structural integrity. *See United States v. Zepeda-Lopez*, 478 F.3d 1213, 1222 (10th Cir. 2007) (affirming the lower court's admission of an opinion that the defendant was the person depicted on a videotape even though the jury watched the videotape and saw the defendant in court); 29 Wright & Miller, *Federal Practice and Procedure* § 6265.1 (2d ed. 2011) (noting that most courts find "expert testimony satisfies the 'help' requirement if it advances the jury's understanding to any degree"). To the extent that LDG disagrees with Wilkens's conclusions, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

**2.** LDG also moves to exclude the testimony of another structural engineer that Western World intends to call, Justin Johnson. Doc. 139. Johnson intends to opine, *inter alia*, that the collapsed wall was visibly bulging outward, that a competent person inspecting the building would have noticed the bulge, that the building was improperly maintained, and that watermarks inside the building indicated old water damage. Doc. 141 at 1. LDG argues that Johnson did not disclose these opinions in his report and that, even if he had, some are not scientific. *Id.*

Federal Rule of Civil Procedure 26 requires that expert reports "contain a complete statement of all opinions to be expressed." Fed. R. Civ. P. 26(a)(2)(B); *Key v. Qualcomm Inc.*, 129 F.4th 1129, 1143 (9th Cir. 2025). Federal Rule of Civil Procedure 37 gives teeth to those requirements, setting out that a party who fails to provide the information required by Rule 26 "is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1); *see Sec. & Exch. Comm'n v. GenAudio Inc.*, 32 F.4th 902, 936 (10th Cir. 2022). When deciding whether a party's Rule 26 violation is justified or harmless, courts must consider any prejudice to the other party, the ability to cure the prejudice, whether allowing the evidence would disrupt the trial, and the violator's bad faith or willfulness. *HCG Platinum, LLC v. Preferred Prod. Placement Corp.*, 873 F.3d 1191, 1200 (10th Cir. 2017).

Three of his proposed opinions may be considered. Specifically, Johnson disclosed in his report that the building had water damage and was improperly maintained, Doc. 141-1 at 7, 8, 16, and that a wall was bulging. Doc. 141-1 at 7, 8. And as noted above, this type of opinion

testimony will help the jury understand the building's structural integrity.

But the opinion that a competent inspector would have noticed a bulge before the collapse is precluded. He failed to disclose the opinion or justify why it should now be considered.[7] *See generally* Doc. 141-1. On that basis alone, the opinion could be excluded. But even if this opinion had been timely disclosed, preclusion is still appropriate because he failed to support it as required under *Daubert*. Johnson did not inspect the building before it collapsed, and he did not explain how he concluded based on a post-collapse inspection that a bulge was noticeable before the collapse. Doc. 141-2 at 12–13. This is insufficient to satisfy the *Daubert* requirements. *See Hampton*, 87 F.4th at 1202 (affirming the district court's exclusion of an expert who "has not attempted to explain in any fashion his methods, testing, peer review, rate of error, independent research, et cetera").

**3.** LDG also moves to exclude Gerald Provencher's opinions, who is Western World's expert and who would opine that Acrisure was not Western World's agent. Docs. 144 & 156. That issue is moot given that Acrisure is no longer a party in the case. *See* Docs. 181 & 183. Accordingly, LDG's motion is denied.

### III

For the foregoing reasons, Western World's Motion for Summary Judgment, Doc. 146, is GRANTED in part and DENIED in part. LDG's Motions to Exclude Expert Testimony, Docs. 137, 139, and 144, are DENIED, GRANTED in part and DENIED in part, and DENIED as moot, respectively.

It is so ordered.


Date:  June 18, 2025                           s/ Toby Crouse
                                        Toby Crouse
                                        United States District Judge

---

[7] Western World offered no response to this argument. *See generally* Doc. 155; *see also Hampton v. Utah Dep't of Corr.*, 87 F.4th 1183, 1201 (10th Cir. 2023) (noting that the proponent of expert testimony bears the burden of showing that the testimony is admissible).